# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Marvin Aspen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 7429 | **DATE** | 7/1/2003 |
| **CASE TITLE** | Bowen Engineering vs. Great Midwest Contracting | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: Bowen's motion for a preliminary injunction is denied. Plaintiff's motion for expedited ruling on preliminary injunction motion (58-1) is moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | **Document Number** |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | JUL 0 2 2003 | | |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | docketing deputy initials | | |
| | Mail AO 450 form. | | 7/1/2003 | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |
| GL | courtroom deputy's initials | | GL | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DOCKETED
JUL 2 2003

| | | |
|---|---|---|
| Bowen Engineering Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02 C 7429 |
| | ) | |
| Village of Channahon, Illinois, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| Great Midwest Contracting Corporation, | ) | |
| | ) | |
| Intervener. | ) | |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Presently before us is plaintiff Bowen Engineering Corporation's ("Bowen") motion for a preliminary injunction. Bowen alleges that defendant, the Village of Channahon ("the Village" or "Channahon") violated federal and state law in selecting intervenor Great Midwest Contracting Corporation ("Great Midwest"), rather than Bowen, to perform certain construction work to expand a wastewater treatment plan for Channahon. Bowen seeks a preliminary injunction ordering that: (1) all work on the wastewater project be immediately suspended; (2) the Village rescind the bid award and contract with Great Midwest; (3) the Village immediately issue to Bowen a notice to proceed with work on the project; and (4) award all other relief that is just and proper.[1]

---

[1] In the alternative, Bowen requests the following relief in the form of a preliminary injunction: (1) an order that Bowen has established the requirements for a preliminary injunction; (ii) a finding that Bowen has established a reasonable likelihood for success on the merits that Bowen was the lowest responsible and responsive bidder; (iii) that all work on the Project be immediately suspended; (iv) a finding that there is a substantial likelihood that the contract



For the following reasons, we deny Bowen's motion.

## I. Background

The Village of Channahon has experienced population growth in recent years. As a result of this growth, there has been an increased demand on the Village's wastewater treatment facilities. The Village expects that the current facility will be near capacity within the year, and will be at capacity by March 2004. The Village, therefore, has undertaken a project to expand its wastewater facilities ("the project"). The Village hired engineering firm Strand Associates, Inc. ("Strand") to design the project. Strand was responsible for preparing bid specifications, administering the bid process, and supervising construction.

### The Regulations

To finance the project, the Village obtained a low interest loan through the Illinois Environmental Protection Agency's ("IEPA") Water Pollution Control Board Revolving Loan Program ("Loan Program"). The United States Environmental Protection Agency ("USEPA") provides funding for the IEPA's Loan Program. The Village contends that, as a condition for obtaining financing approval for the project, it was required by the State to follow certain regulations set forth at 35 Ill. Admin. Code part 365. These regulations are, in turn, required by the terms of an agreement between the IEPA and the USEPA. In accepting the grant from the USEPA, the IEPA

---

between the Village and Great Midwest is void because the contract was entered into in violation of state and federal law; and (v) for all other relief just and proper. Our denial of Bowen's motion for preliminary injunction applies to both Bowen's main and alternative requests for relief.

2

agrees to certain terms and conditions concerning utilization of Small, Women, and Minority's Business Enterprises.[2]

Under the USEPA requirements, the IEPA must negotiate with the USEPA to develop fair share goals for DBE participation in environmental construction projects.[3] The fair share objectives negotiated by the State and USEPA for FY 2002 were 2% for MBEs and 11% for WBEs. In developing these goals, the IEPA relied upon a state-wide study conducted in 1997. The Village, as a recipient of the IEPA loan, had the option of using the state-wide objectives negotiated by the USEPA and IEPA or determining their own objective, subject to review by IEPA. The aim of the fair share objectives is to "expand the pool of bidders to include these types of businesses, not to use race or ethnicity in the actual decision." Def. Ex. E at 2. Thus, a recipient of a loan from the IEPA must publish the fair share objectives, but need not ensure that they objective be satisfied. The recipient must also make the fair share objectives available to organizations owned or controlled by socially and economically disadvantaged individuals, women, and historically black colleges and universities. In addition, the recipient of the loan must include in bid documents the fair share objectives and must require all its contractors to include in their bid documents for subcontracts the negotiated fair share percentages.

---

[2]For purposes of this opinion, we will use the abbreviation "DBE" (disadvantaged business enterprise) when referring to Small Business Enterprises ("SBEs"), Minority Business Enterprises ("MBEs"), and Women's Business Enterprises ("WBEs") together. MBE, WBE, and SBE will be used when there is a distinction between the three or when they appear in a quotation.

[3]If the State does not wish to rely on these goals it may "submit proposed MBE/WBE goals based on availability of qualified minority and women-owned businesses to do work in relevant market for construction, services, supplies, and equipment." Bowen submission Ex. C. These fair share objectives are subject to approval by the USEPA.

Under the USEPA and IEPA loan program, loan recipients must also follow the six affirmative steps contained in various sections of the Code of Federal Regulations governing federal grants to states. *See* Defendant's Ex. C. Under the USEPA loan program, "[t]he State must agree to comply and require all recipients of funds 'directly made available by' capitalization grants to comply with applicable Federal authorities." 40 C.F.R. §35.3145(a); *see also* Def. Ex. C. Federal regulations require loan recipients to accomplish their fair share objectives by complying with six affirmative steps designed to widen the pool of subcontracting applicants. In particular, loan recipients should: (1) include small, minority, and women's businesses on solicitation lists; (2) assure that small, minority, and women's businesses are solicited whenever they are potential sources; (3) divide total requirements, when economically feasible, into small tasks or quantities to permit maximum participation by small, minority and women's businesses; (4) establish delivery schedules, when the requirements of the work permit, which will encourage participation by small, minority and women's businesses; (5) use the services of the Small Business Administration and the Office of Minority Business Enterprise of the U.S. Department of Commerce, as appropriate; and (6) require any subcontractors to take these affirmative steps. *See* 40 C.F.R. §35.3145(d).[4] To receive USEPA funding, Illinois and, in turn, the loan recipient, must also ensure that projects assisted with federal funds comply with the DBE requirements by ensuring that adequate records are retained to demonstrate compliance with the requirements. *See* Def. Ex. E at 4, Def. Ex. C.

---

[4]Another section of the federal regulations, 40 C.F.R. §31.36(e), which provides uniform administrative requirements for grants and cooperative agreements to state and local governments regarding USEPA grants, also requires the grantee and subgrantee of the loan to take all necessary affirmative steps to assure that DBEs are used when possible.

Furthermore, Illinois statute required that Channahon's construction contract instruct contractors to include in their bids "[e]vidence that the contractor has taken affirmative steps, such as, but not limited to, a copy of the advertisement(s) and the record of negotiation in accordance with federal Executive Order 11625 and 12138, to assure that small, minority and women's businesses are used when possible as sources of supplies, equipment, construction and services." 35 Ill. Admin. Code 365.620 (d)(2)(4) (West 2002).

### Channahon's Bid Specifications

To meet its obligations under its contract with the USEPA, IEPA assisted Channahon in complying with the DBE requirements by providing the Village with a packet entitled "Documentation Required In Plans and Specifications for Sewage Treatment Works Projects to be Constructed Under the Water Pollution Control Loan Program." Def. Ex. F. The front page of the packet contains the following language: "[t]he attached front-end document package *may* be utilized by the loan applicant to comply with the regulations of the Water Pollution Control Loan Program. The loan applicant's use of the front-end document package...will help expedite the overall review of your project's contract documents." *Id.* (emphasis added). A loan applicant's nonuse of the IEPA's sample specifications will not affect the priority given by the Agency to the loan. The IEPA provided sample documents that could be included with Channahon's bid specifications to guarantee compliance with the requirements of the IEPA and USEPA. Channahon was not obliged to use these documents and had the option of developing its own language subject to review by the IEPA. *See* Pl. Ex. C at 28.

Likewise, Channahon had the option of accepting the fair share goals negotiated between the USEPA and IEPA or developing its own objectives, subject to approval by the IEPA. Strand

employee Jane Carlson prepared the bid specifications for Channahon. Carlson testified that when assembling the bid specifications she used the MBE specifications contained in the IEPA sample documents. These documents, and ultimately Channahon's bid specifications, contained two sets of DBE objectives: one set applicable to the state, and the other to each county. Carlson stated that she included both sets of percentages because she was following the sample documents provided by the IEPA. Neither Strand nor Channahon performed any independent analysis, surveys, or studies to determine which DBE percentages Channahon should use in their specifications. Carlson testified that she did not discuss the objectives with anyone from Channahon. Edward Dolezal, Director of Public Works for the Village of Channahon, gave deposition testimony that he was not aware of any discrimination in public contracting by the Village and that the Village has never received any complaints of discrimination with regard to public works construction.

Channahon began advertising for bids in June 2002. The Village's bid specifications contained several pages relating to the DBE requirements. Article 28 of VOC's bid specifications deals with the Utilization of Small, Minority, and Women's Businesses. Article 28.02.01 defines a MBE as a business which is : "(1) Certified as socially and economically disadvantaged by the Small Business Administration, (2) certified as a minority business enterprise by a State or Federal agency, or (3) an independent business concern which is at least 51 percent owned and controlled by minority group member(s).[5]" The specifications define a WBE as "a business which is certified as such by

---

[5] A minority group member is an individual who is a citizen of the United States and one of the following: (i) Black American; (ii) Hispanic American (with origins from Puerto Rico, Mexico, Cuba, South or Central America); (iii) Native American (American Indian, Eskimo, Aleut, native Hawaiian); or (iv) Asian-Pacific American (with origins from Japan, China, the Philippines, Vietnam, Korea, Samoa, Guam, the U.S. Trust Territories of the Pacific, Northern Marianas, Laos, Cambodia, Taiwan or the Indian subcontinent).

6

a State or Federal agency" or which "is an independent business concern which is at least 51 percent owned by a woman or women who also control and operate it."

The Village's bid specifications state that the IEPA is committed to establishing an effective DBE policy which meets the intent of federal guidelines such as 40 C.F.R. 35.3145(d). The purpose of the policy is to increase DBE participation "by insuring that small, minority, and women's businesses are informed of all subcontracting opportunities, and by providing the small, minority, and women's businesses and opportunity to submit proposals or quotations." Art. 28.02.8. With regard to fair share objectives, the Village's bid specifications state that:

> 28.02.9 It is the policy of the State of Illinois to award a fair share of subagreements to small, minority, and women's businesses. In complying with this requirement, Bidders or offerers are required to take affirmative steps to assure that small, minority, and women's businesses are used when possible as sources of supplies, equipment, construction, and services explained herein.
>
> 28.02.11 As required by the award conditions of USEPA's Assistance Agreement with IEPA, the fair share percentages are 2% for MBEs and 11% for WBEs.

The bid specifications outline specific pre-contract award obligations for contractors with respect to DBEs. For example, bidders must "advertise subcontracting opportunities and to negotiate with small, minority, and women's businesses prior to bid opening." Art. 28.03.1. Bidders are also required to "contact and encourage the participation of small, minority, and women's businesses prior to bid opening. Affirmative efforts (the written record of conscientious and honest communications between the Bidder and small, minority, and women's business) must be initiated and completed by the Bidder prior to Bid opening." Art. 28.03.3. Bidders must document their efforts to advertise and otherwise contact DBEs prior to submitting their bid.

Bidders can document their efforts in one of three ways. Bidders utilizing small, minority, and women's businesses must submit "letters of intent" signed by the bidder and subcontractor. Art. 28.01.3. Bidders not utilizing small, minority, and women's businesses must either provide a complete, signed and notarized certificate attesting that the bidder will award no subagreements in performance of the contract, *see* Art. 28.04.1.1, or specific documentation of the bidder's efforts to solicit DBEs.[6] If the bidders do "not receive any inquiries or proposals from qualified small, minority, and women's businesses prior to Bid opening, [they] must provide a written, notarized certification attesting that no responses or proposals were received." Art. 28.04.1.8. A bidder's failure to submit the appropriate documentation will cause the Village to reject the bid as nonresponsive. *See* Art. 28.04.1.10; *see also* Art. 28.05.1.

### Bowen's Bid

On or about June 20, 2002, Bowen became aware that the Village was soliciting bids for the wastewater construction project. Bowen obtained the bid specifications for the project and made efforts to comply with the DBE requirements. Bowen placed an advertisement in the Chicago Tribune on July 15 and July 16, 2002. The Capital Development Board of Illinois compiles a

---

[6] Such documentation includes: (1) "certification of publication" or adequate evidence of proof of publication including an actual copy of the newspaper advertisement from the "key" newspaper utilized by each's bidder based upon the project's locality, Art. 28.04.1.2; (2) names and contact information of qualified DBEs who submitted proposals to the bidder, 28.04.1.3; (3) names and contact information of qualified DBEs to be utilized and the names and contact information for qualified DBEs who submitted proposals to the bidder but will not be utilized, as well as justification for non-utilization, 28.04.1.4; (4) description of the work to be performed by the DBEs, including the dollar amount, Art. 28.04.1.5; (5) completed, signed and notarized certification from the DBEs to be utilized attesting that they are a small, minority, and/or women's business as defined by the USEPA, Art 28.04.1.6; and (6) completed, signed, and notarized certification from the Bidder that it does not have a controlling or dominating interest or conflict of interest with the DBE that is proposed to be utilized, Art. 28.04.1.7.

directory of female- and minority-owned businesses in an effort to assist contractors in soliciting DBEs. There is evidence that Bowen relied upon this directory in developing a list of DBEs from which it then solicited bids via mailed notices and phone calls. Bowen kept records of these efforts.

Bowen claims that despite these efforts it did not receive any proposals or bids from qualified DBEs. Therefore, pursuant to article 28.04.1.8, Bowen submitted with its bid a "Bidder Certification" informing the Village that it had not received inquiries or proposals from qualified DBEs. Bowen also submitted a second certification that it would not be awarding any subcontracts. Contrary to Bowen's assertions, the Village contends that Bowen received proposals from five entities that identified themselves as either a MBE or WBE.[7] Bowen claims that these businesses did not submit with their bids evidence that they were qualified DBEs. Accordingly, Bowen contends, it was justified in treating these businesses as unqualified and certifying to the Village that it had not received bids from qualified DBEs. The Village contends that two of the five DBEs who submitted bids, Ability Rockroad and B&R Electric Venture Contractors, were on the Capital Development Board's list of certified MBE/WBEs, which Bowen used in soliciting bids.

At the bid opening on August 15, 2002, it was determined that Bowen had submitted the lowest bid and that Great Midwest had submitted the second lowest bid. On August 19, 2002, Great Midwest filed an objection claiming that the Village should not award the contract to Bowen because Bowen did not comply with the DBE requirements. On August 22, 2002, Bowen wrote to Channahon requesting that it de-certify that Bowen would not be using any subcontractors. The letter further stated that it had not received any proposals from MBE/WBEs. It was not until

---

[7] Bowen allegedly received bids from the following DBEs Garth Masonry Corporation, International Test & Balance, Inc., S&S Finance, Inc., Ability Rockroad Co., and B&R Electric Venture Contractors.

9

Channahon further investigated the matter on August 30, 2002, that it learned that Bowen had received bids from five DBEs. Because Bowen had submitted a false certification stating that it had received no bids from qualified DBEs, and its failure to submit documentation in accordance with sections 28.04.1.3 and 28.04.1.4, Channahon did not award the bid to Bowen. On September 16, 2002, Channahon awarded the bid to Great Midwest and informed Bowen that it would not be awarded the bid. That same day, Great Midwest agreed to indemnify Channahon up to $35,000.00 in legal fees in the event the contract was awarded to Great Midwest and Bowen sued Channahon. Bowen filed the instant suit on October 16, 2002.

## II. Analysis[8]

A plaintiff seeking a preliminary injunction must show "(1) a likelihood of success on the

---

[8] The Village contends that we should deny Bowen's motion for a preliminary injunction because Bowen waived or is estopped from challenging the bid specifications. Channahon does not site one federal case in support of the proposition that an entity waives its constitutional rights under the Equal Protection Clause by seeking to participate in a potentially discriminatory system before challenging the constitutionality of that system. We find that Bowen has not waived its right to challenge the bid specifications and is not estopped from doing do. There are, however, repercussions from Bowen's decision to challenge the specifications relative late in the process. We will consider these repercussions in analyzing the comparative harms to Bowen, the Village, Great Midwest, and the public.

The Village also contends that Bowen's allegations constitute an impermissible collateral attack on federal and state requirements. We do not agree. With regard to collateral attacks, the Seventh Circuit has held that "[i]f the state does exactly what the statute expects it to do, and the statute is conceded for purposes of the litigation to be constitutional, we do not see how the state can be thought to have violated the Constitution." *Milwaukee Pavers Ass'n v. Fiedler*, 922 F.2d 419, 423 (7th Cir. 1991). The USEPA and IEPA gave the Village substantial leeway to tailor its DBE requirements to its own circumstances and needs. The statute therefore did not dictate that the Village follow a particular cause of action. The Village chose not to do so, instead simply adopting the sample documents provided by the IEPA without discussion or debate. Furthermore, Bowen has not conceded that the underlying statutes are constitutional. We therefore find that Bowen's suit is not an impermissible collateral attack.

merits, (2) irreparable harm if the preliminary injunction is denied, and (3) the inadequacy of any remedy at law." *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999). Once this threshold showing is made, the Court must balance (4) the harm to the plaintiff if the preliminary injunction were wrongfully denied against the harm to the defendants if the injunction were wrongfully granted, and (5) the public interest. *See id.* The burden on Bowen in this case, however, is even greater. Bowen seeks a mandatory preliminary injunction, that is, an order requiring an affirmative act by Channahon. Such injunctions are "cautiously viewed and sparingly issued." *Graham v. Medical Mutual of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997) (citing *Jordan v. Wolke*, 593 F.2d 772, 774 (7th Cir. 1978)). Thus, we can grant Bowen's mandatory preliminary injunction only "upon the clearest equitable grounds." *Id.* (citing *W.A. Mack, Inc. v. General Motors Corp.*, 260 F.2d 886, 890 (7th Cir. 1958)).

### 1. Bowen's Likelihood of Success on the Merits

#### A. Equal Protection Under the Law

Bowen contends that the Village's DBE specifications for the construction of the wastewater treatment plant violate the Equal Protection Clause of the Fourteenth Amendment in that they establish a racial classification that does not satisfy strict scrutiny. It is uncontroverted that "all classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). Our analysis, therefore, is two-fold. First, we must determine whether the Village's bid specifications contained a racial classification. If our answer to this question is affirmative, we must proceed to the second step, strict scrutiny analysis.

*i. The Village's Bid Specifications Contain a Racial Classification*

The Village argues that its specifications are a mere outreach program that do not constitute a racial classification. In support of its argument, the Village relies heavily on a vacated Eleventh Circuit opinion and a handful of district court opinions from other jurisdictions.[9]

By contrast, the Sixth, Ninth and District of Colombia Circuits have found that affirmative action plans that require solicitation and encourage, if not mandate, the use of minorities applicants constitute racial preferences so as to implicate strict scrutiny. The program at issue in *Safeco Insurance Co v. Cty of White House*, 191 F.3d 675 (6th Cir. 1999), was virtually identical to the

---

[9] *See generally Allen v. Alabama State Bd. of Educ.*, 164 F.3d 1347, 1352 (11th Cir. 1999) (vacated on joint motion of the parties) ("where the government does not exclude persons from benefits based on race, but chooses to undertake outreach efforts to persons of one race, broadening the pool of applicants, but disadvantaging no one, strict scrutiny is generally inapplicable); *Honadle v. University of Vermont and State Agricultural College*, 56 F. Supp.2d 419, 428 (D. Ver. 1999)(recognizing a "distinction between 'inclusive' forms of affirmative action, such as recruitment and other forms of outreach, and 'exclusive' forms of affirmative actions, such as quotas, set asides and layoffs); *Sussman v. Tanoue*, 39 F. Supp.2d 13, 27 (D. D.C. 1999) ("the program in this case falls within the category of programs, those conscious of race but devoid of ultimate preferences, which have been consistently upheld by courts").

There is some indication that the Seventh Circuit might endorse an analysis that the term "racial classification" does not include race-conscious programs that are devoid of ultimate preferences. *See South-Suburban Housing Center v. Greater South Suburban Bd of Realtors*, 935 F.2d 868 (7th Cir. 1991). The *South-Suburban* court interpreted the Fair Housing Act's prohibition against discriminating "because of race," 42 U.S.C. §3604(a), and section 3604(c)'s prescription against making any advertisement that "indicate[] any preference, limitation, or discrimination based on race." The court found that a corporation's efforts to attract white home buyers to regions predominantly populated by African-Americans did not constitute a racial preference, even though the corporation specifically targeted white home buyers and maintained lists, by race, of all persons who were shown the property. The central principle behind the *South-Suburban* decision was the distinction between mere outreach to members of a particular race and granting an ultimate preference. Although *South-Suburban* may demonstrate some inclination on the part of the Seventh Circuit to agree with the reasoning in *Allen*, we follow guidance from the Supreme Court and other circuits dealing with racial preferences under the Equal Protection Clause, rather than Fair Housing Act.

program at issue in the instant case. The goal of the *Safeco* program was to achieve a fair share of DBE participation. Like Channahon, the defendant in *Safeco* required bidders to take positive steps to utilize small, minority, and women's businesses. Bidders were required to document their compliance with the DBE rules and the defendant retained the right to reject bids that did not comply. *Id.* at 678. Although the *Safeco* court analyzed the specifications under strict scrutiny, it avoided holding that minority solicitation requirements, in and of themselves, necessarily constitute a racial preference: "*[p]erhaps* ... the government imposes a racial classification when it compels all contractors to solicit minority subcontractors. After all, such a policy would impose compliance costs on contractors and will harm white subcontractors *if it imposes a racial preference.*" *Id.* at 690 (emphasis added). The *Safeco* court found evidence that the defendant required more than mere solicitation because it indicated during discovery that contractors were mandated to accept competitive bids from MBE subcontractors. Thus, the court held that the defendant's administration of the regulations "indisputably pressure[d]" contractors to hire minority subcontractors even if it does not expressly require such action. *Id.* at 692.

The reasoning applied by the D.C. Circuit in *MD/DC/DE Broadcasters Association v. Fed'l Communications Commission*, 236 F.3d 13 (D.C. Cir. 2001), was similar to the theory relied upon by the Sixth Circuit in *Safeco*. At issue in *MD/DC/DE Broadcasters* was an FCC policy that required stations to "establish, maintain and carry out a positive continuing program of specific practices designed to ensure equal opportunity and nondiscrimination in every aspect of station employment policy and practice." *Id.* at 16. Under the plan, stations were required to seek out resources for referrals for women and minority applicants. *See id.* at 17. Stations also had to record the race and sex of applicants and each person hired. *See id.* The FCC would investigate the

13

recruitment efforts of stations who had too few women or minorities in their applicant pool. *See id.* at 19. The court found that the reporting requirements and potential investigation by the FCC were "a powerful threat" that all but compelled stations to hire minorities and women. *Id.* The court further concluded that the FCC's focus on the race and gender of applicants and hires at stations belied its statement that the only goal of the program was to effectuate outreach. *Id.* The court continued on to reject the reasoning in *Allen*, stating that "[t]he Commission has designed a rule under which nonminorities are less likely to receive notification of job openings solely because of their race; that the most qualified applicant from among those recruited will presumable get the job does not mean that people are being treated equally – that is, without regard to their race – in the qualifying round." *Id.* at 21. Accordingly, the court found that the program was subject to strict scrutiny.

The Ninth Circuit also found an outreach program to be a racial classification in *Montery Mechanical Co v. Wilson*, 125 F.3d 702 (9th Cir. 1997). Like Channahon's specifications, the program at issue in *Montery Mechanical* required contractors to make good faith efforts to solicit bids from DBE subcontractors. *See id.* at 704. Unlike Channahon's program, however, the plan in *Montery Mechanical* excused contractors from the solicitation requirements if they themselves qualified as a DBE and retained a substantial amount of the work for themselves. *See id.* The court found that this element of the affirmative action plan awarded a preference to minority and women-owned businesses in that they did not have to comply with the minority solicitation requirements imposed on non-DBEs. *See id.* at 709. The court further found that the solicitation requirements, in conjunction with the benefit awarded to minority- and women-owned general contractors, constituted a racial preference. As the Ninth Circuit explained:

Though worded in terms of goals and good faith, the statute imposes mandatory requirements with concreteness. The scheme requires distribution of information only to members of designated groups, without any requirement or condition that persons in other groups receive the same information. Thus the statute may be satisfied by distribution of information exclusively to persons in the designated groups. Bidders in the designated groups are relieved, to the extent they keep the required percentages of work, of the obligation to advertise to people in their groups. The outreach the statute requires is not from all equally, or to all equally. *Id.* at 711.

As in *Montery Mechanical*, Channahon's bid specifications granted a preference to minority subcontractors who were solicited by bidders, and disadvantaged non-minority subcontractors who were not contacted and, perhaps, never learned of the subcontracting opportunities. The definition of "racial classification" to include programs that are devoid of ultimate preferences is supported by *Adarand*'s characterization of racial preferences in terms of benefits and burdens because of race. *See* 515 U.S. at 222. Although the preference is slight, we conclude that the solicitation requirements in Channahon's bid specifications amount to a benefit to minority and women-owed subcontractors. Furthermore, the mandatory nature of the specifications and the requirement that bidders justify nonuse of low DBE bidders weigh in favor of a classification.

### (ii) Strict Scrutiny

Having found that Channahon's specifications likely establish a race-based preference, we must conduct a strict scrutiny analysis. *See Croson*, 488 U.S. at 493. Under strict scrutiny, "classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Adarand*, 515 U.S. at 227. Remedying past discrimination is a compelling governmental interest where the government entity can "show that it had essentially become a 'passive participant' in a system of racial exclusion practiced by elements of the local construction industry." *Croson*, 488 U.S. at 493. The Village of Channahon has not made such a showing.

15

The Village cannot show that its DBE requirements were necessary to remedy past efforts. Channahon often does not use DBE specifications on its projects because the Village seeks to keep specifications simple and does not believe discrimination in construction is a problem in Channahon. In the case of the wastewater treatment facility, Channahon included the DBE provisions only because they believed they were required to do so by the IEPA. Edward Dolezal, Director of Public Works for the Village, testified that, but for the IEPA regulations, he did not see any "need to have an MBE/WBE requirement." Pl. Ex. C at 84. Dolezal further stated that he was not aware of any actions or general patterns by the Village or its representatives that discriminated against the classes favored by the regulations or made it more difficult for them to big on public works projects in Channahon. *See id.* at 103. Moreover, no MBE or WBE contractor has ever lodged a complaint with the Village regarding its bidding practices, nor have any MBE or WBE contractors ever filed lawsuits challenging discrimination in the Village's bidding practices. *See id.* at 110. Channahon therefore has not established that it had a compelling interest in remedying past discrimination.

Even if Channahon had such an interest, its classification was not narrowly tailored. Channahon's specifications were overinclusive in that they included minority groups such as Aleuts and Eskimos, for which there is no evidence of discrimination in the region surrounding Channahon. In *Croson*, the Supreme Court found that "[t]he random inclusion of racial groups that, as a practical matter, may never have suffered from discrimination in the construction industry in Richmond suggests that perhaps the city's purpose was not in fact to remedy past discrimination." *Id.* at 506. Channahon's haphazard inclusion of random minority groups indicates that the Village included the groups "without attention to whether their inclusion was justified by evidence of past discrimination." *Id.* (citing Drew Days, *Fullilve*, 96 YALE L. J. 453, 482 (1987)).

16

Despite the apparent lack of discrimination in Channahon's construction industry, Channahon adopted the IEPA's sample bid specifications rather than developing a more appropriate race-neutral plan. Channahon used the MBE fair share objectives that were derived from a state-wide 1997 IEPA study. The Village does not maintain any reports, studies, analysis, or data to suggest that there is a pattern, either currently or historically, of any discrimination in the awarding of bids for public contracts in Channahon. *See* Pl. Ex. C at 104. Likewise, Dolezal had no knowledge of the Village ever conducting its own research to determine the most appropriate fair share objectives for minority and women participation. *See id.* at 105. This evidence indicates that the Village lacked a "strong basis in evidence for its conclusion that remedial action was necessary." *See Croson*, 488 U.S. at 500.

Channahon, however, argues that it was required by the USEPA and IEPA to include the DBE requirements in their bid specifications. Although the state and federal governments imposed some obligations on Channahon, the Village's hands were far from tied.[10] Illinois statute requires that construction contracts receiving loans under the program include "[e]vidence that the contractor has taken affirmative steps, such as, but not limited to, a copy of the advertisement(s) and the record of negotiation, in accordance with federal Executive Order 11625 and 12138[11], to assure that small,

---

[10]There is dicta in *Builders Association* indicating that where local governments are charged with enforcing state laws preventing private discrimination the municipalities need not demonstrate that they are acting to remedy their own past discrimination. 256 F.3d at 644. Presumably then, a showing that the statute is designed to remedy discrimination by the state as a whole is sufficient. To date, no court has applied this exception. Because this dicta does not comport with *Croson*, and because the IEPA statute left Channahon with considerable discretion to develop its own plan with regard to DBEs, we do not follow this exception.

[11]These Executive Orders do not mandate the racial preference included in Channahon's specifications.

minority and women's businesses are used when possible." 35 Ill. Admin. Code part 365.620(d)(4). Furthermore, Channahon was under no obligation to use the sample documents provided by the IEPA. *See* Def. Ex. F. The front page of the sample documents reads "[t]he attached front-end document package *may* be utilized by the loan applicant to comply with the regulations of the Water Pollution Control Loan Program ... [and will] expedite the overall review of your project's contract documents." *Id.* (emphasis added).[12] The evidence indicates that, prior to this litigation, neither the Village nor its consulting firm, Strand, gave much thought to the DBE requirements and whether they were required to use the sample provided by the IEPA. Strand employee Jane Carlson demonstrated that the consulting company and the Village put little, if any consideration into the issue of minority participation or the need to remedy Channahon's past discrimination. Neither Channahon nor Strand conducted any research into whether, and to what extent, Channahon needed a remedial race-conscious program.[13]

We therefore conclude that Bowen has a likelihood of success in establishing that Channahon's bid specifications violated the Equal Protection Clause.

---

[12] Despite this clear statement, Dolezal contends that he was told by Roger Vollbracht, an IEPA Project Manager, that Channahon had to use the front-end documents. To the contrary, Mr. Vollbracht gave deposition testimony that the Village was not obligated to use the sample documents, but rather was free to develop their own program and submit it to the IEPA for review. *See* Pl. Ex. C at 28.

[13] Had Channahon put forth greater effort, it could have developed a race-neutral plan that satisfied the IEPA requirement. Such a plan would have included more accurate fair share percentages based on empirical evidence concerning minority participation in the relevant market. *See Croson*, 488 U.S. at 502. Furthermore, there is no evidence that Channahon investigated the possibility of using race-neutral solicitation and advertisement requirements to satisfy the objectives of the IEPA. *See Duffy v. Wolle*, 123 F.3d 1026, 1030 (8th Cir. 1997) (upholding recruiting requirement that positions be advertised in a publication of national circulation to reach all persons who might be interested so as to develop an open, nationwide, diverse pool of qualified applicants).

## B. IEPA Regulations

Bowen also argues that it is likely to prevail on the merits because Channahon, in accepting Great Midwest's offer to indemnify the Village in the event of a legal challenge by Bowen, violated the Illinois Criminal Code and the IEPA procurement regulations, thus rendering the contract between Great Midwest and Channahon void. As an initial matter, we fail to see the relevance of Channahon's potential, and unlikely, criminal responsibility in this civil motion for a preliminary injunction. Channahon's allegedly wrongful conduct in relation to the bidding process for the wastewater treatment facility can be more appropriately considered under the Illinois Administrative Code.

The Illinois Administrative Code prohibits the "providing and administration of loans by the State of Illinois, and of subagreements awarded by loan recipients under those loans, must be accomplished free from bribery, graft, kickbacks, and other corrupt practices." 35 Ill. Admin. Code 365.610(h)(1). Bowen contends that Channahon's acceptance of Great Midwest's offer of indemnification constituted a "corrupt practice." We do not agree. Under the cannon of construction *ejusdem generis,* "where general words follow the enumeration of particular classes of things, the general words will be construed as applying only to things of the same general class as those enumerated." Black's Law Dictionary, 517 (6th ed. 1990). Applying this cannon of construction, we find that Channahon's acceptance of Great Midwest's indemnification offer does not constitute a "corrupt practice" within the meaning of section 365.610(h)(1).

Bowen also points to a regulation requiring that bidding documents contain "a clear explanation of the method of bidding, the method of evaluation of bid prices, and the basis and method for award of contract." 35 Ill. Admin. Code 365.620(b)(1)(C); *see also* 35 Ill. Admin. Code

19

365.620(b)(3)(A) (requiring that bids be evaluated according to the methods and criteria set forth in the bidding documents). Bowen contends that the contract between Great Midwest and Channahon is void because, in awarding the contract, the Village considered a factor, Great Midwest's offer to indemnify Channahon, that was not set forth in the bidding documents. Plans and bid specifications must be as detailed as possible. *See Smith v. Intergovernmental Solid Waste Disposal Assoc.*, 605 N.E.2d 654, 665 (Ill. App. 1992). In the instant case, it would not have been possible for Channahon to include an indemnification provision in the bid specifications because at the time it formulated the specifications it did not know that indemnification would be necessary. Furthermore, the variance alleged in the contract is not material because it did not give Great Midwest "a substantial advantage or benefit not enjoyed by other bidders." *Id.* at 666. At the time Channahon awarded the bid to Great Midwest, it believed that Great Midwest was the lowest responsible bidder and was therefore entitled to the contract. Because Channahon believed that Great Midwest was the winning bidder, Great Midwest's offer of indemnification did not afford them an advantage over contractors who had submitted higher or nonresponsive bids. We therefore find that Bowen does not have a likelihood of establishing that the contract between Channahon and Great Midwest is void under the Illinois Administrative Code.

## 2. Preliminary Injunction Analysis

Having concluded that Bowen has a marginal likelihood of success on the merits,[14] we now turn to the other requirements for a preliminary injunction.

---

[14]Contrary to Bowen's assertions, we do not believe that Bowen has established that it has an "overwhelming" likelihood of success on the merits. Affirmative action is a controversial and ambiguous area of the law. At this early stage of the litigation it is possible only to find that Bowen has some likelihood of success.

Bowen has satisfied the second element under the preliminary injunction standard: that it will be irreparably harmed if the preliminary injunction is denied. "When violations of equal protection rights are alleged in petition seeking injunctive relief, further showing of irreparable injury may not be required." *Back v. Bayh*, 933 F. Supp. 738, 754 (N.D. Ind. 1996). Bowen has also established that it has no adequate remedy at law. Damages will not make Bowen whole in the event that its rights to equal protection were violated.

Accordingly, we must now balance the harm to Bowen if the preliminary injunction were wrongfully denied against the harm to the defendants if the injury were wrongfully granted, and the public interest. *See Cooper*, 196 F.3d at 813. We must also take into account that the relief Bowen is seeking, a mandatory preliminary injunction, is an extraordinary remedy.

Because we believe that the balancing of these factors weighs against Bowen, we deny its motion for a preliminary injunction.

As previously discussed, the harm to Bowen if the injunction is wrongfully denied is the continued deprivation of its rights under the Equal Protection Clause. In addition, in the event that the injunction is wrongfully denied, Bowen will likely be permanently denied the opportunity to perform work on Channahon's wastewater treatment facility. While we recognize that these are serious harms, we believe they are outweighed by the combined harm to the Village and the public in the event that the injunction is wrongfully granted.

21

As stated earlier, Channahon's wastewater treatment facility is steadily nearing capacity. It is estimated that the plant will be at its capacity by early 2004.[15] According to Great Midwest's current schedule for the project, work should be substantially complete by March 2004 and complete by June 2004. The project is currently approximately 16% complete. Channahon and Bowen disagree regarding the delay in construction that would result from our imposition of an injunction: Channahon contends that the delay could be as great as 30 months, while Bowen contends that it could complete the work according to Great Midwest's current schedule.[16] Although Channahon's estimation of the possible delay seems somewhat inflated, we find implausible Bowen's contention that it can complete the project on time if an injunction is issued. In fact, we believe that the delay could be quite substantial.

The efficacy of Channahon's wastewater treatment facility is obviously of crucial importance to the Village. A delay in the completion in the wastewater treatment facility would prove disastrous for the Village and the public. There is currently a great deal of commercial and residential

---

[15]Bowen contends that "[t]he Seventh Circuit requires that any assessment of the harms inherent in any matter seeking injunctive relief to address and remedy deprivations and/or violations of constitutionally protected rights and liberties are to be made at the time the request for injunctive relief was filed." Pl. Supp. Brief at 3. Bowen's argument is a clear misstatement of the law. The cases cited by Bowen involved motions seeking to enjoin the sale of land. See Patsy Paris, et al. v. Dep't of Housing and Urban Development, 713 F.3d 1314, 1344 (7th Cir. 1983); Bastian v. Lakefront Realty Corp., 581 F.2d 685 (7th Cir. 1978); Ramsburg v. American Investment Company of Illinois, 231 F.2d 333 (7th Cir. 1956). At issue in those cases was whether the motions for preliminary injunction were moot because the land sale had been completed. The Seventh Circuit held that it is within the discretion of the court to order the defendant to restore the status quo where the court still has jurisdiction. See Patsy Paris, 713 F.3d at 1344. These cases simply do not require us to assess the harms as of the date that Bowen requested injunctive relief.

[16] Predictably, Great Midwest agrees with Channahon's assertion that the construction would be delayed by an injunction.

development in Channahon, including the construction of literally thousands of homes and a downtown type area for the Village. It is estimated that 300 housing units will be added to the wastewater treatment plan by 2004. Once the wastewater treatment plan reaches its capacity, however, the IEPA will prohibit the connection of any other residential or commercial structures. Thus, a delay in construction "would effectively bring a halt to the continued development of the six subdivisions currently platted and two others currently in the planning stages." A delay would therefore injure the individuals who have contracted for homes in these subdivisions, the developers of the subdivisions and commercial buildings, and the overall economy of Channahon.

In addition, any interruption to the construction is likely to cause significant work and cost. The construction is now approximately 16% completed. The work already performed by Great Midwest and its subcontractors includes survey and layout work, substantial excavations, the placement of underground piping, the placement of rebar for concrete work, and the pouring of concrete, the submission of approximately 130 shop drawings, and placement of orders for the manufacturing and fabrication of major pieces of equipment. An injunction prohibiting Great Midwest from continuing work would also impact the subcontractors and suppliers with whom Great Midwest has contracted, potentially spawning continued litigation with a myriad plaintiffs. Additionally, any delay could cause damage to supplies or tools already on site, erosion of the earth work already completed, and increased costs to the Village in the form of insurance or storage facilities. We are unconvinced by Bowen's argument that, if granted the injunction, it could prevent many of these harms by simply stepping into Great Midwest's shoes with little delay or disruption to existing subcontracts.

23

In sum, Channahon's wastewater treatment needs, combined with the harms that would be caused to the Village, Great Midwest, and many Channahon residents outweigh the potential harm to Bowen.[17] We therefore decline to grant Bowen the extraordinary remedy of a mandatory preliminary injunction.

## III. Conclusion

For the foregoing reasons, we deny Bowen's motion for a preliminary injunction. It is so ordered.

Marvin E. Aspen
U.S. District Judge

Date: 7/1/03

---

[17] Also weighing against Bowen is its four month delay in bringing this suit. Bowen became aware of Channahon's bid specifications, including the DBE provisions, in June 2002, yet Bowen waited until October 2002, after the bidding process had been completed and Great Midwest had been awarded the bid, to challenge the plan. Bowen half-heartedly attempted to comply with the DBE requirements. It did not attempt to challenge the racial classifications contained in the specifications until its plan was rejected for noncompliance. Had Bowen challenged the specifications earlier, before the bidding process was completed, it would have been much easier for this Court to grant Bowen's injunction.